JAMES SQUARE NURSING
HOME, INC., Plaintiff,

v.

Brian WING, as Acting Commissioner of the Department of Social Services of the State of New York, Defendant.

Civ. No. 93–CV–477 (FJS).

United States District Court,
N.D. New York.

Aug. 29, 1995.

Sherrin & Glasel, Albany, NY (Jeffrey J. Sherrin, of counsel), Kronish, Lieb, Weiner & Hellman, New York City (Jerome T. Levy, of counsel), for Plaintiff.

Dennis C. Vacco, Attorney General of NYS, Syracuse, NY (Joanne Hunt Piersma, Asst. Attorney General, of counsel), for Defendant.

O'Connell and Aronowitz, Albany, NY, (Cornelius D. Murray, of counsel), for Amicus Curiae.

## DECISION AND ORDER

SCULLIN, District Judge.

### INTRODUCTION

This matter is before the Court on plaintiff James Square Nursing Home, Inc.'s ("James Square") motion for a preliminary injunction and on the parties' cross-motions for summary judgment. James Square is a nursing home that provides services to Medicare and Medicaid patients. Defendant Brian Wing is the Acting Commissioner of the Department of Social Services for the State of New York who is in charge of administering and implementing the Medicaid program in New York.[1] In the underlying 42 U.S.C. § 1983 action, plaintiff seeks declaratory and injunctive relief preventing defendant from utilizing its Medicaid audit procedure to secure reimbursement for alleged overpayment of Medicaid funds. Initially by order of the Court, and later by consent of the parties, a Temporary Restraining Order issued that enjoins defendant from recouping any funds from plaintiff as a result of its Medicaid audit for the years 1986 through 1991. Plaintiff then moved for a preliminary injunction, and thereafter, both parties moved for summary judgment. By consent of the parties the Court consolidated all the motions, which are the subject of this Decision and Order.[2]

---

1. Gregory Kaladjian was the Acting Commissioner of the Department of Social Services when this action was initiated. Since then, Brian Wing has been substituted as Acting Commissioner and, accordingly, is hereby substituted as the named defendant in this action. Fed. R.Civ.P. 25(d).

2. Also before the Court is a motion by the New York State Health Facilities Association, Inc. ("NYSHFA") to appear as Amicus Curiae. The district court has broad inherent authority to permit or deny an appearance as amicus curiae in a case. *United States v. Ahmed,* 788 F.Supp. 196, 198 n. 1. (S.D.N.Y.), *aff'd,* 980 F.2d 161 (2d Cir.1992). The defendants oppose the motion claiming that the NYSHFA (a not-for-profit association that represents about 240 nursing homes throughout New York State) is interested in the outcome of the case and has merely repeated arguments made by plaintiffs. Although "[t]he partiality of a would-be amicus is a factor to consider ... '[t]here is no rule .. that amici must be totally disinterested.'" *Concerned Area Residents v. Southview Farm,* 834 F.Supp. 1410, 1413 (W.D.N.Y.1993) (quoting *Hoptowit v. Ray,* 682 F.2d 1237, 1260 (9th Cir.1982)). After reviewing the submissions in this matter the Court grants NYSHFA's motion to appear as Amicus Curiae because it believes that NYSHFA's brief will aid in the determination of the motions at issue.

## BACKGROUND

This action concerns the interplay between two distinct but related health care programs—Medicare and Medicaid. A brief overview of the programs is a helpful beginning.

The Medicare Act, 42 U.S.C. §§ 1395 *et seq.* was enacted to provide medical insurance for people over 65 years of age and for certain disabled people. Part A of Medicare provides for payment of in-patient services. Enrollment in Part A is automatic. Part B of Medicare provides the option of receiving supplementary insurance for medical services not covered under Part A, including out-patient services, physician's services, physical therapy, drugs, speech therapy, occupational therapy, psychotherapy, social work and laboratory services (collectively referred to as "ancillary services"). *Id.* §§ 1395j to 1395w–4(j). To enroll in Part B, eligible patients must pay insurance premiums and an annual deductible. *Id.* §§ 1395o to 1395s. Once enrolled, the federal government pays 80% of the reasonable costs and charges for ancillary services, and the patients themselves must pay the remaining 20%. 42 U.S.C. § 1395cc(a)(2)(A). The premium, deductible and the 20% co-payment are collectively referred to as "cost-sharing amounts." Medicare reimburses providers based on a fee-for-service basis, that is, generally it pays for the reasonable costs and charges of each service rendered.

The Medicaid Act, 42 U.S.C. §§ 1396 *et seq.*, was enacted to pay for medical care for poor people, regardless of age. The federal government and the states jointly fund the Medicaid program. Together, the participating state and the federal government provide 100% of a patient's Medicaid costs (with 50–50 participation). *Id.* § 1396d(b). Unlike the Medicare fee-for-service payments, the Medicaid program in New York provides a daily ("per diem") rate for each patient at a particular facility. Generally, the per diem rate is an estimate of the average cost that a facility will incur for each patient, including costs for ancillary services and non-ancillary services. The per diem rate takes into account the direct costs (e.g., labor) and indirect costs (e.g., utilities and rent) associated with providing care, and is based in part on the cost of providing care in previous years. A facility receives the per diem rate for each day a Medicaid patient is treated, regardless of the actual nature and scope of treatment provided.

The Medicare program was designed to provide medical care to eligible elderly and disabled without regard to income. Thus Medicare is available to people who are needy enough to also be eligible for Medicaid. The people who are eligible for both Medicare and Medicaid are referred to as "dual eligibles." Because dual eligibles may not be able to afford the Medicare cost-sharing amounts, a state may agree to pay the cost-sharing amounts on their behalf and thereby acquire Part B coverage for them. 42 U.S.C. § 1395v. Such agreements are referred to as "buy-in" arrangements. Buy-in arrangements save states money because once the dual eligibles are covered by Medicare, the Federal government pays 80% of the reasonable costs and charges for ancillary services rather than the across-the-board 50% share of the Medicaid per diem. New York State has a buy-in arrangement for dual eligibles.

This case concerns the problem that arises when a health care facility provides ancillary services to dual eligibles and thus potentially may be reimbursed under both Medicare and Medicaid. At issue is whether the procedure developed by the state to prevent a health care facility from receiving double payment for the same service is appropriate.

In order to avoid paying a facility for ancillary services that Medicare is going to pay for, the state developed a method of offsetting its Medicaid payments. The state starts with the facility's Medicaid per diem rate, which, as stated, includes reimbursement for ancillary services and non-ancillary services. Then the state estimates, based on past experience, what the facility is going to receive from the federal government as payment from Medicare Part B for providing ancillary services (i.e., 80% of the reasonable costs and charges). The state then pays the facility its Medicaid per diem rate minus the estimate of the Medicare Part B payments. That offset is referred to as a "carveout."

After a facility receives its actual Medicare Part B payment, the state conducts an audit of the facility to reconcile the carveout. If the audit reveals that the actual Medicare Part B payments exceeded the estimate, and thus reveals that the state carved out too small an amount, then the facility owes the state. If the audit reveals that the actual Medicare Part B payments were less than the estimate, and thus that the carveout was too large, then the facility is entitled to a refund. In short, the procedure developed by the state to assure that a provider does not receive double payment for ancillary services is simply to deduct whatever payment the provider receives from Medicare Part B for ancillary services from the Medicaid per diem rate owed to the provider by the state.[3]

The plaintiff claims that the Medicare Part B payments for ancillary services (i.e., 80% of the reasonable costs and charges) invariably exceed the portion of Medicaid per diem payments that cover the same services. Thus when the state offsets from the Medicaid payments an amount equal to the Medicare Part B payments, it is offsetting too much. The state claims that it cannot calculate exactly the portion of Medicaid per diem rate that specifically covers ancillary services and therefore it is entitled to offset the entire amount that the plaintiff receives from Medicare Part B for those services.

In the case at bar, the state audited the plaintiff in 1986 and 1987 to reconcile the carveout for those years. On January 10, 1991, the state notified plaintiff that based on plaintiff's actual Medicare Part B receipts, the carveout for 1986 and 1987 was too small, and that plaintiff owed the state $246,286. The plaintiff challenged the audit at an administrative hearing. On December 31, 1992, the Administrative Law Judge determined that the auditing method was proper and that the state was entitled to offset the Medicaid payments by the full amount that Medicare Part B paid for the ancillary services. Thereafter plaintiff initiated this action in federal court claiming that the state's actions violate the Medicare Act and Medicaid Act and seeking declaratory and injunctive relief preventing defendant from utilizing its audit policy to recover the alleged Medicaid overpayment from plaintiff.

## DISCUSSION

▮ Plaintiff acknowledges that the state can properly offset its Medicaid rate to prevent a double payment for ancillary services, but that the state, by offsetting the full Medicare payment for those services, is offsetting too much. The plaintiff maintains that as a provider of ancillary services to Medicare patients it is entitled to the full 80% of the reasonable costs and charges from Medicare. As stated, the state claims that it is entitled to recoup the full amount that plaintiff receives as Medicare Part B payments for dual-eligible patients. A crucial issue that the Court must first decide is whether the patient is considered primarily Medicare or primarily Medicaid.

That issue was most directly addressed in *New York City Health and Hospitals Corp. v. Perales*, 954 F.2d 854 (2d Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992). There, the Second Circuit had to determine the legality of a regulation that prevented health providers from receiving the full Medicare rate for ancillary services provided to dual eligible patients. New York had enacted a regulation that provided that the state would not pay cost-sharing amounts for dual eligibles if the Medicare payment exceeded the Medicaid rate for those services.[4] *Id.* at 856–57.

3. It is worthy to note here that there is no dispute in this case that the state is paying its cost-sharing amounts for dual-eligible patients, that is, the state is paying the premiums, deductibles and 20% of the reasonable costs and charges for dual-eligible patients. The focus here is on the state's procedure of offsetting the Medicaid per diem rate by the amount that Medicare Part B pays for ancillary services (i.e., 80% of the reasonable costs and charges).

4. New York State offered the following illustration of how the regulation worked:

Example: Medicaid Fee or Rate = $45.00

| Medicare | [80%] | Balance |
|---|---|---|
| Approved | Medicare Paid | Due |
| $80.00 | $6[4].00 | $0.00 |

A claim should not be submitted to Medicaid in this example.

\* \* \* \* \* \*

Example: Medicaid Fee or Rate = $50.00

"[B]ecause the scheduled Medicaid payments [were] almost invariably less than 80% of the corresponding reasonable costs or charges of a given type under Medicare" the provider "almost never collect[ed] more than 80% of their reasonable costs or charges." *Id.* at 857. The state argued that dual eligible patient should be treated as primarily Medicaid patients and providers should not be entitled to recover from the state any amount above the Medicaid rate for ancillary services.

The court rejected the state's argument reasoning that dual eligibles must be considered as primarily Medicare patients.[5] *Health and Hospitals Corp.*, 954 F.2d at 858–59. The court held that under the Medicare Act, "providers who furnish medical care to Medicare-eligible patients have the right to collect 100% of their reasonable costs and charges." *Id.* at 858. The court further found that the Medicaid Act, 42 U.S.C. § 1396a(a)(10)(E) requires that state funds be made available to pay cost-sharing amounts and that 42 U.S.C. § 1396a(n) "clarif[ies] that the Medicaid Act does not prohibit a provider from accepting more than the Medicaid Rate." Thus, "a Medicare provider need not be satisfied with inadequate payment, i.e., less than reasonable costs or charges, even when that provider is treating a Medicare patient who happens also to be

| Medicare Approved | [80%] Medicare Paid | Balance Due |
|---|---|---|
| $60.00 | $48.00 | $2.00 |

A claim should be submitted to Medicaid for the amount of $2.00.
*N.Y.C. Health and Hospitals v. Perales*, 954 F.2d 854, 857 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992). Because the court invalidated the regulation, the proper result in the illustration is that the provider should recover $16.00 as cost-sharing from the state in the first example and $12.00 in the second example.

5. The court explained that "[i]f Medicaid were in fact the controlling program, then one would expect providers to be compensated at the Medicaid rate, instead of at 80% of the Medicare rate." *Health and Hospitals Corp.*, 954 F.2d at 858. Furthermore, "Congress sought to avoid a wealth-based, two-tiered system of health care for the elderly and certain disabled and indeed wanted to integrate *all* of those who were Medicare eligible into the existing health care system." *Id.* at 859.

poor." *Id.* at 860; *accord Pennsylvania Medical Soc'y v. Snider*, 29 F.3d 886, 896 (3d Cir.1994); *Rehabilitation Ass'n of Virginia v. Kozlowski*, 42 F.3d 1444, 1459 (4th Cir. 1994); *Haynes Ambulance Serv. Inc. v. Alabama*, 36 F.3d 1074, 1076 (11th Cir.1994).

Although *Health and Hospitals Corp.* is somewhat distinguishable, its holding that dual eligible patients must be considered primarily Medicare patients and a provider is entitled to receive the full Medicare rate, that is, 100% of its reasonable costs and charges, is even more compelling in the present case.[6] Starting with the premise that the Medicare Part B payment for a particular ancillary service (i.e., 80% of the reasonable costs and charges) will be higher than the Medicaid rate for the same service,[7] it can easily be seen that the state's audit policy will result in the plaintiff receiving less than the Medicare rate for treating Medicare patients. Indeed the state admits that the plaintiff does not receive the Medicare rate for a particular service, rather the state tries to ensure that "the provider receives the *full Medicaid rate*, but no more, for its dual eligibles." Def.'s Mem. of Law in Support of Summary Judgment at 16 (emphasis added). Under the circumstances of this case, the state is withholding from the plaintiff federal funds intended for the provider of services. In accord with *Health and Hospitals Corp.*,

6. *Health and Hospitals Corp.* dealt with the state's obligation to pay Medicare cost-sharing amounts. At issue here is whether the state can prevent the plaintiff from receiving the full 80% of its reasonable costs and charges from Medicare.

7. Of course the state does not accept this premise outright. The state contends that the rates cannot be directly compared because they are created in fundamentally different ways. However, it is beyond dispute that at least in some instances the Medicare Part B payment for ancillary services (i.e., 80% of the reasonable costs and charges) will exceed the Medicaid reimbursement for the same ancillary service. *See Health and Hospitals Corp.*, 954 F.2d at 857 (With respect to out-patient ancillary services the court noted that "the scheduled Medicaid payments are almost invariably less than 80% of the corresponding reasonable cost and charges of a given type of care under Medicare.").

954 F.2d 854, dual-eligible patients are primarily Medicare patients and the plaintiff is entitled to receive the full Medicare rate for providing ancillary services to those patients.[8]

■ Notwithstanding the clear authority for this conclusion, the state further argues that its position is consistent with the principle that Medicaid is a payor of last resort. However, preventing the state from offsetting the full Medicare Part B payment does not offend that principle. As a payor of last resort, the state Medicaid agencies are empowered to seek reimbursement from third parties who are liable for care and services paid for by Medicaid, such as ancillary services. 42 U.S.C. § 1396a(a)(25). As a matter of common sense, Medicaid agencies can only recover to the extent that the third party is liable for the services and to the extent that Medicaid actually paid for the services. 10 N.Y.C.R.R. § 86–2.17(m) (The Medicaid per diem rate "shall be reduced by income earned for Medicare part B eligible services to the extent that Medicaid has paid for those services."). Even with this limitation Medicaid ultimately will not have to pay for the services for which Medicare is liable. Thus limiting the state's offset to the amount it actually paid for services does not prevent Medicaid from being a payor of last resort.[9]

■ Finally, the state contends that because the Medicaid and Medicare rates are determined in fundamentally different ways, it cannot determine what amount of the Medicaid per diem rate is attributable to the cost of ancillary services and therefore it is appropriate to offset the full Medicare payment, even though the Medicare rate is usually higher than that allowed under Medicaid. See Harr-Wood, 497 N.Y.S.2d 203. The weakness of the state's argument is exposed when taken to its logical extreme. For example, if the Medicare Part B reimbursement were so generous that it exceeded the total Medicaid reimbursement (i.e., the costs of ancillary services and non-ancillary services), use of the state's audit policy would result in the state paying nothing for all the services rendered, and, would result in the provider paying money to the state. Such a result is nonsensical, and the Court refuses to accept such an argument.

The Court is not satisfied that the state cannot properly determine what portion of the Medicaid per diem rate is allocated to ancillary services. The mere fact that it may be difficult to develop a formula which would more accurately reflect the percentage of per diem attributable to ancillary services does not absolve the state of its responsibility to do so. Because dual-eligibles are treated primarily as Medicare patients, and because providers are entitled to recover 100% of their reasonable costs and charges for treating Medicare patients, the state's offset must be limited to what Medicaid would actually pay for the ancillary services provided to the dual eligible patients. Therefore, the state's audit allowing an offset for the amount paid by Medicare for ancillary services violates the Medicare Act, 42 U.S.C. §§ 1395 et seq. and the Medicaid Act, 42 U.S.C. §§ 1396 et seq. Accordingly plaintiff is entitled to sum-

---

**8.** The state relies on *Harr-Wood Nursing Home v. Perales*, 113 A.D.2d 535, 497 N.Y.S.2d 203 (3d Dep't 1986) for the proposition that providers must accept the Medicaid rate as payment in full for Medicaid services. *Harr-Wood* held that the state was entitled to recover all the Medicare Part B payments a provider received because the Medicaid rate also included payment for those services. *Id.; see also Rego Park Nursing Home v. Perales*, 206 A.D.2d 781, 615 N.Y.S.2d 773 (3d Dept.1994). *Harr-Wood's* holding, however, seems to be based in part on the conclusion that if the provider were allowed to retain any of the Medicare Part B payments, the provider "may be viewed as having violated Federal law by charging Medicare at a rate greater than the Medicaid rate (*see*, 42 U.S.C. § 1396h[d][1])." *Harr-Wood*, 497 N.Y.S.2d at 205 n.*. The vitality of

this conclusion is questionable, however, after *Health and Hospitals Corp.*, which specifically recognized 42 U.S.C. § 1396a(n), "authorizes payment beyond the Medicaid amount." *Health and Hospitals Corp.*, 954 F.2d at 859; *see also Pennsylvania Medical Soc'y v. Snider*, 29 F.3d 886, 890 (3d Cir.1994) ("Section 1396a(n) states that a state plan may provide a payment amount for Part B services exceeding the amount otherwise payable under a Medicaid plan."). In any event, this Court does not find *Harr-Wood* to be controlling authority.

**9.** Of course, if the state is concerned that its Medicaid reimbursement rate is too high it can make necessary adjustments through the rate-making process.

mary judgment and a declaration that the state's policy violates the Medicare Act, 42 U.S.C. §§ 1395 *et seq.* and the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.* and is entitled to an injunction enjoining the state from utilizing its audit policy.[10]

Therefore, it is hereby

ORDERED that the New York State Health Facilities Association, Inc.'s motion to appear as Amicus Curiae in this action is GRANTED; and it is further

ORDERED that plaintiff's motion for summary judgment is GRANTED and defendants are ENJOINED from applying their audit policy to plaintiff for the years 1986 through 1991; and it is further

ORDERED that defendant's audit policy as applied in this case violates the Medicare Act, 42 U.S.C. §§ 1395 *et seq.* and the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.*

**IT IS SO ORDERED.**

---

**10.** Because of the Court's holding, it need not   resolve the plaintiff's remaining arguments.