The JEWISH HOME AND HOSPITAL
FOR AGED, Plaintiff,

v.

Brian J. WING, as Acting Commissioner
of the New York State Department of
Social Services, and Patricia A. Wood-
worth, as Director of the Budget of the
State of New York, Defendants.

No. 95 Civ. 5126 (JES).

United States District Court,
S.D. New York.

Feb. 11, 1997.

Cadwalader, Wickersham & Taft (Peter G. Bergmann, Brian T. McGovern, of counsel) New York City, for Plaintiff.

Dennis C. Vacco, Attorney General of the State of New York (Vincent Leong, Assistant Attorney General, of counsel), New York City, for Defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge:

Pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343, and 1367, plaintiff The Jewish Home and Hospital for Aged ("Jewish Home") filed the instant action seeking injunctive and declaratory relief under the Medicare Act, 42 U.S.C. § 1395 *et seq.*, with respect to New York's audit methodology for recouping federal Medicare program Part B reimbursements. Pursuant to Federal Rule of Civil Procedure 56(c), Jewish Home moves for summary judgment arguing that it is entitled to recover 100% of its reasonable costs and charges for Medicare Part B services rendered under the Medicare Act. Defendant Brian J. Wing, as Acting Commissioner of the Department of Social Services (the "DSS"), and defendant Patricia A. Woodworth, as Director of the Budget of the State of New York (together "defendants"), cross-move for summary judgment against Jewish Home.[1] For the reasons set forth below, Jewish Home's motion for summary

---

1. On behalf of defendant Woodworth, defendants separately argue that she is entitled to summary judgment because she was not involved in the DSS's acts being challenged herein.

judgment is granted as against defendant Wing and denied as against defendant Woodworth, defendant Woodworth's cross-motion for summary judgment against Jewish Home is granted, and defendant Wing's cross-motion for summary judgment against Jewish Home is denied.

## BACKGROUND

The instant action involves the interplay between the Medicare Act, 42 U.S.C. § 1395 et seq., and the Medicaid Act, 42 U.S.C. § 1396 et seq. Therefore, a brief review of both statutory schemes is warranted.

Congress enacted the federal Medicare program to provide Americans over the age of sixty-five (65) and certain disabled individuals with an inpatient hospital insurance plan ("Part A") and an optional supplementary insurance plan ("Part B"). See 42 U.S.C. § 1395 et seq. (1991); Plaintiff's Statement of Undisputed Facts Pursuant to Local Rule 3(g) ("Pltf's Rule 3(g) Stmt.") ¶ 7. Part B includes certain physician and ancillary services, hospital outpatient services, and other health services generally not covered under Part A. See Pltf's Rule 3(g) Stmt. ¶ 7. In order to enroll in Part B coverage, a patient must pay an annual deductible and certain premiums. Id. ¶ 9. The patient then pays "co-payments" equal to 20% of the reasonable costs and charges for any services received. Id. The federal government pays the remaining 80%. Id. Medicare reimburses providers retrospectively on a fee-for-service basis in accordance with a cost report and settlement. Id. ¶ 8.

Congress enacted Medicaid to provide access to health care for indigent individuals. See 42 U.S.C. § 1396 et seq. (1991); Pltf's Rule 3(g) Stmt. ¶ 3. Medicaid is a joint federal and state funded system. Id. States electing to participate in Medicaid must propose a plan for approval by the Secretary of the United States Department of Health and Human Services. See 42 U.S.C. §§ 1396a(a), 1396a(b). The plan includes a schedule of payment rates for different kinds of medical services. See 42 U.S.C. § 1396a(a). Once approved, the federal government agrees to assist the state by providing federal Medicaid funds. Id. Health care providers agree to accept the government rate as payment in full, and may not request that a patient pay any additional charges. See 42 U.S.C. § 1320a–7b(d) (1996). Medicaid prospectively reimburses providers at a per-diem rate. See 42 U.S.C. § 1396a(a). Rates in a given year are set on the basis of costs reported by a facility in a prior period, called the "base year", which are limited by certain ceilings, and trended forward to the rate year to account for inflation. See Pltf's Rule 3(g) Stmt. ¶ 4.

Under Medicaid, the reimbursement rates for nursing facilities are composed of four components: direct, indirect, noncomparable, and capital. See N.Y.Comp.Codes R. & Regs. tit 10, § 86–2.10 (1996); Pltf's Rule 3(g) Stmt. ¶ 5. The direct component reimburses base year costs related to patient care, including nursing administration, physical, occupational, and speech therapy, patient activities, social services, pharmacy, central services supplies, and transportation services. See 10 N.Y.C.R.R. § 86–2.10(c); Pltf's Rule 3(g) Stmt. ¶ 5. The indirect component reimburses base year costs not directly related to patient care, such as fiscal/administrative services, housekeeping, food services, medical education, and grounds/maintenance. See 10 N.Y.C.R.R. § 86–2.10(d); Pltf's Rule 3(g) Stmt. ¶ 5. The noncomparable component reimburses facility-specific base year costs which, because of their nature, are not subject to comparison with other facilities, including physician services, laboratory services, electrocardiograms, electroencephalograms, radiology, inhalation therapy, podiatry, dental, and psychiatric services, and other ancillary services. See 10 N.Y.C.R.R. § 86–2.10(f); Pltf's Rule 3(g) Stmt. ¶ 5. The capital component reimburses certain building costs, fixed and moveable equipment costs, costs of capital improvements, and mortgage interest expense. See 10 N.Y.C.R.R. §§ 86–2.10(g), 86–2.19—86–2.22; Pltf's Rule 3(g) Stmt. ¶ 5.

Indigent elderly and disabled, known as "dual eligibles", can qualify for both programs. See Pltf's Rule 3(g) Stmt. ¶ 10. Because dual eligibles effectively cannot afford Medicare Part B, Congress established a "buy in" procedure whereby states could ob-

tain Part B coverage for dual eligibles by agreeing to pay Medicare's cost-sharing amounts on their behalf. *Id.*

Since Medicare Part B and Medicaid coverage overlap with respect to certain services, particularly physician and ancillary services, the DSS attempts to reconcile the differences between the two systems and recoup any monies paid to a healthcare provider under Medicaid which may be duplicative of federal Medicare Part B payments. *See* Pltf's Rule 3(g) Stmt. ¶ 12; N.Y.C.R.R. § 86–2.17(m). Under the methodology in effect for the 1975 through 1979 rate years, the DSS recouped the lower of the amount of Medicaid reimbursements or Medicare receipts for Part B services in the audited rate year. *See* Affirmation of David Adest in Support of Jewish Home's Motion for Summary Judgment dated February 12, 1996, at ¶ 19, attached to Plaintiff's Notice of Motion for Summary Judgment dated February 12, 1996.

In 1980, in anticipation of the reimbursement expected from the federal government under Medicare, the New York State Department of Health (the "NYSDOH") instituted a graduated reimbursement system with one rate of reimbursement for Medicaid patients with Medicare Part B coverage, and a different higher rate for Medicaid patients without Part B coverage. *See* Pltf's Rule 3(g) Stmt ¶¶ 12, 13. The difference between the two rates, often termed the "carve-out", is a preliminary estimate of the amount of duplicative payments the NYSDOH expects a nursing home to receive from the Medicare program for Part B services rendered to Medicaid patients. *Id.* ¶ 13. The DSS later conducts final audits to reconcile the payments made by the two programs and to recoup any duplicative payments. *Id.* ¶ 14. Up until the 1986 rate year, the DSS Medicare Part B audit methodologies permitted providers to retain a portion of their Medicare part B receipts to cover the costs for Part–B eligible services rendered to Medicaid patients in excess of the Medicaid reimbursement. *Id.* ¶ 15.

In 1986, the NYSDOH implemented a new audit methodology known as "RUG–II", the substance of which remains in effect, which establishes patient classifications based on the estimated expected amount of resources necessary to care for each patient. *See* Pltf's Rule 3(g) Stmt. ¶¶ 16, 17. A primary goal of the RUG–II methodology is to provide a financial incentive for nursing facilities to admit and provide care to more resource-intensive patients, whose cost of care in a nursing home is less than in a hospital. *Id.* ¶ 18. The number of resource-intensive patients admitted by a nursing home is reflected in that facility's case mix index ("CMI"). *Id.* As a facility's CMI rises, the Medicaid reimbursement methodology positively adjusts the direct component of a nursing home's reimbursement rate to reflect increases in the expected resources needed to care for sicker patients. *Id.* ¶¶ 18, 25. However, the RUG–II methodology does not provide any rate adjustment to account for increased noncomparable costs, such as physician and certain ancillary services. *Id.* ¶ 27.

Jewish Home is a 514–bed not-for-profit nursing facility certified to provide services under the New York State Medicaid and federal Medicare programs. *See* Pltf's Rule 3(g) Stmt. ¶¶ 1, 2. Since the adoption of the RUG–II audit methodology, Jewish Home altered its admission policies to care for more resource-intensive patients, resulting in its CMI increasing by 25% from 1.021 in January, 1986, to 1.27 in December, 1988. *See id.* ¶¶ 25, 26, 42. Jewish Home also hired three additional physicians and added ancillary services. *Id.* ¶ 28. Jewish Home's Medicaid reimbursement rate was not adjusted to reflect its increase in staff expenditures. *See id.* ¶¶ 29, 31.

On August 30, 1989, the DSS announced that it would seek to recoup all federal Medicare Part B reimbursements for any patient eligible for Medicaid in accordance with Medicaid's provision that it is a payor of last resort. *See* Pltf's Rule 3(g) Stmt. ¶¶ 30, 37. This new methodology was extended to apply retroactively to "rate" years after 1986. *Id.* ¶ 33.

During 1990 and 1991, the DSS audited Jewish Home using the new audit methodology. *See* Pltf's Rule 3(g) Stmt. ¶ 43. From 1986 through 1988, Jewish Home received

over $60,000,000 in Medicaid reimbursement and $3,120,894 in Medicare part B payments. *See* Defendants' Statement Pursuant to Civil Rule 3(g) of the Material Facts Which are Not in Dispute ("Defts. Rule 3(g) Stmt.") ¶¶ 3, 7. The DSS' first audit involved the rate years of 1986 and 1987, and set the amount of recoupment at $806,622. *See* Pltf's Rule 3(g) Stmt. ¶¶ 43–45. The DSS' second audit involved the 1988 rate year, and set the amount of recoupment at $722,076. *Id.* ¶ 46. The difference between the full Medicare part B amount, $3,120,894, and the total recoupment sought for all three years, $1,528,738, had already been carved out of Jewish Home's Medicaid rate. *See* Defts. Rule 3(g) Stmt. ¶ 10.

Pursuant to 18 N.Y.C.R.R. § 519.4, Jewish Home requested a hearing to contest the audits, which was held on seven separate days, commencing on July 27, 1992, and concluding on March 29, 1994. *See* Pltf's Rule 3(g) Stmt. ¶ 47; Decision After Hearing ("Decision"), attached as Exh. A to Plaintiff's Notice of Motion for Summary Judgment dated February 12, 1996. On March 6, 1995, a DSS administrative law judge ("ALJ") upheld the actions taken by the DSS and the new audit methodology. *See* Decision at 25–26. The ALJ observed that the direct costs of providing the services in dispute were provided for in the computation of the Medicaid rate for Jewish Home. *Id.* at 11. "[A]ll that matters is whether a Medicaid payment is received; the relationship of the amount of the payment to the cost of the service is irrelevant. None of the statutes and regulations concerning these rules create an exception for a facility for which the physician or ancillary service component of its Medicaid rate is less than the cost of providing the service." *Id.*

On July 10, 1995, Jewish Home commenced the instant action seeking a judgment declaring that (i) the DSS' new Part B audit methodology, as developed and applied to Jewish Home, and the Decision, violate (a) the federal Medicare Act; (b) the due process and equal protection clauses of the United States Constitution; (c) the New York State Constitution, Administrative Procedure Act §§ 202 and 203, Executive Law § 102,

the NYSDOH's regulations, and common law; (ii) declaring null and void and without force and effect the DSS' new Part B audit methodology and the Decision; (iii) enjoining the DSS from utilizing the new Part B audit methodology in any pending or future Part B audits of Jewish Home; (iv) enjoining defendants from recouping Jewish Home's Medicare Part B receipts pursuant to the new Part B audit methodology; and (v) granting Jewish Home reasonable attorneys' fees and such other relief as the Court deems just.

Pursuant to Federal Rule of Civil Procedure 56(c), Jewish Home moves for summary judgment on the grounds that (1) the current DSS audit methodology violates the Medicare Act and contravenes the NYSDOH's reimbursement regulations; (2) the "payment in full" and the "payor of last resort" principles do not justify the DSS' recoupment of Jewish Home's Medicare Part B income; (3) the exemption of some nursing homes from the DSS' audit methodology violates the equal protection and due process clauses of the U.S. Constitution; and (4) the DSS audit methodology violates the New York State Constitution and New York's Administrative Procedure Act.

Defendants cross-move for summary judgment on the grounds that defendant Woodworth was not involved in the acts being challenged; that Jewish Home's Medicare Part B receipts are not insulated from Medicaid recoupment; that there is no merit to Jewish Home's equal protection and due process claims; that Jewish Home's pendent state claims should be dismissed together with the federal claims; and that Jewish Home's state claims lack merit.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–52, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986). In considering a moving party's motion for summary judgment, the Court views all facts and construes all rational inferences derived

therefrom in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). In this case, summary judgment must be granted on Jewish Home's claim that the DSS' audit methodology violates the Medicare Act.

In *New York City Health and Hospitals v. Perales,* 954 F.2d 854, 860 (2d Cir.), *cert. denied,* 506 U.S. 972, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992), the Second Circuit invalidated a regulation by which New York State would not pay its Medicare Part B cost-sharing under its buy-in arrangement with the federal government except when the 80% Medicare reimbursement share was less than the Medicaid rate. The Second Circuit stated that the regulation, by deeming dual eligibles to be primarily Medicaid rather than Medicare patients, prevented health care providers from collecting their reasonable costs or charges, and as a result, was fundamentally at odds with Congress' vision in enacting the Medicare Act. *Id.* at 859. "As we hold today, a Medicare provider need not be satisfied with inadequate payment, *i.e.,* less than reasonable costs or charges, even when that provider is treating a Medicare patient who happens also to be poor." *Id.* at 860.

In the instant action, defendants attempt to distinguish *Health and Hospitals* by arguing that the court never addressed whether a provider is entitled to both Medicare Part B and 100% Medicaid reimbursement for dual eligibles. Defendants further argue that *Health and Hospitals* never stated or suggested that Medicaid's "payor of last resort" and "payment in full" principles do not apply to Medicare Part B.

Defendants arguments are without merit. In *James Square Nursing Home, Inc. v. Wing,* 897 F.Supp. 682 (N.D.N.Y.1995), *aff'd,* 84 F.3d 591 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 360, 136 L.Ed.2d 252 (1996), a district court annulled the same DSS Part B audit methodology involved in the instant case. There, the court rejected the DSS' rationale that New York State has the prerogative to recoup all Medicare part B receipts under the Medicaid principles of "payor of last resort" and "payment in full." In accord with *Health and Hospitals,* the court

held that dual eligible patients are primarily Medicare patients and a provider is entitled to receive the full Medicare rate for providing ancillary services to those patients. *Id.* at 686–87. After the parties had appeared for Oral Argument on the instant motions, the Second Circuit affirmed that decision for substantially the reasons given by the district court, and the Supreme Court denied certiorari. *See James Square Nursing Home, Inc. v. Wing,* 84 F.3d 591 (2d Cir.1996); *Wing v. James Square Nursing Home, Inc.,* —— U.S. ——, 117 S.Ct. 360, 136 L.Ed.2d 252 (1996).

■ This Court finds the reasoning articulated in both *Health and Hospitals* and *James Square* dispositive. Jewish Home does not dispute defendants' right to be subrogated to that portion of the payments that reflects what amounts to double coverage. *See* Transcript of Oral Argument dated April 12, 1996, at 3. However, the DSS may not, through its audit methodology, deprive Jewish Home from collecting 100% of its reasonable costs and services, as calculated under Medicare. Because the Court rejects defendants' argument that the Medicaid rate constitutes payment in full so as to preclude collection of costs and expenses under the Medicare Act, summary judgment must be granted for Jewish Home on that ground.

■ Defendants argue that defendant Woodworth is separately entitled to summary judgment because she was not involved in the DSS' acts or the Hearing. In its complaint, Jewish Home alleges that Woodworth, as Director of the Budget of the State of New York, is responsible for approving the Medicaid reimbursement rates determined and certified to her by the Commissioner of Health. Complaint ¶ 10. However, Jewish Home, in the instant case, does not challenge those actions. Nor does Jewish Home discuss how defendant Woodworth was involved in the DSS' March 6, 1995 Decision. Indeed, Jewish Home did not respond to defendants' argument addressed to this issue in its Memorandum of Law in Opposition to Defendants' Cross–Motion for Summary Judgment or at Oral Argument. Therefore, the action must be dismissed as against defendant Woodworth.

The Court need not reach Jewish Home's other arguments that the DSS' new Part B

audit methodology violates the due process and equal protection clauses of the United States Constitution, the New York Constitution, or New York statutory and common law.

## CONCLUSION

For the reasons set forth above, Jewish Home's motion for summary judgment is granted against defendant Wing and denied against defendant Woodworth, defendant Woodworth's cross-motion for summary judgment against Jewish Home is granted, and defendant Wing's cross-motion for summary judgment against Jewish Home is denied. The Court declares the DSS' new Part B audit methodology, as developed and applied to Jewish Home, and the Decision, violative of the Medicare Act, and therefore null and void and without force and effect. The DSS is enjoined from utilizing the new Part B methodology in any pending of future Part B audits of Jewish Home. Defendant Wing is enjoined from recouping Jewish Home's Medicare Part B receipts pursuant to the new Part B audit methodology. The Court denies Jewish Home's request for attorneys' fees pursuant to 42 U.S.C. § 1988. The Clerk of Court is directed to enter judgment accordingly and close the above-captioned action.

It is **SO ORDERED.**