THE JEWISH HOME AND HOSPITAL
FOR AGED, Plaintiff,

v.

Brian J. WING, Commissioner of the
New York State Department of
Social Services Defendant.

No. 97 Civ. 5393(JES).

United States District Court,
S.D. New York.

March 30, 2000.

Cadwalader, Wickersham & Taft, New York City (Peter G. Bergman, Brian T. McGovern, of counsel), for Plaintiff.

Dennis C. Vacco, Attorney General for the State of New York, New York City (James Hershler, Jennifer Rossan, Assistant Attorneys General, of counsel), for Defendant.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff The Jewish Home and Hospital for Aged ("Jewish Home") brings the instant action against Defendant Brian J. Wing, Commissioner of the Department of Social Services ("defendant" or "DSS"), to enforce rights to Medicare reimbursement granted by this Court in a previous action, *The Jewish Home and Hospital for Aged v. Wing,* 954 F.Supp. 96 (S.D.N.Y.1997) (J. Sprizzo) (*"Jewish Home I"*). For the reasons set forth herein, the Court grants both Jewish Home's motion for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and its requests for declaratory and injunctive relief.[1]

---

1. The Court denied defendant's cross-motion for summary judgment at Oral Argument on September 4, 1998. *See* Transcript of Oral Argument dated September 4, 1998 ("Oral

## BACKGROUND

At issue in this action is the propriety of DSS's newest audit methodology that attempts to measure the degree to which Medicare Part B payments to a nursing facility duplicate Medicaid payments for the same services. In *Jewish Home I*, this Court found that DSS's previous audit methodology improperly assumed that Medicaid was "payment in full" for sums due under Medicare to such facilities. 954 F.Supp. at 100; *see also James Square Nursing Home, Inc. v. Wing*, 897 F.Supp. 682, 687 (N.D.N.Y.1995), *aff'd*, 84 F.3d 591 (2d Cir.1996), *cert. denied*, 519 U.S. 919, 117 S.Ct. 286, 136 L.Ed.2d 205 (1996) (invalidating the same methodology for the same reasons). Accordingly, this Court ruled that Jewish Home was entitled to 100% of its reasonable Medicare costs, and that DSS was entitled to recoup only those Medicare payments that in fact duplicated payments by Medicaid. *See Jewish Home I*, 954 F.Supp. at 100.

Jewish Home here challenges the audit methodology implemented by DSS subsequent to that action, arguing that, in contravention of *Jewish Home I*, the new methodology again enables DSS to improperly recoup non-duplicated Medicare payments. As discussed *infra*, Jewish Home alleges that the new audit methodology improperly assumes that Medicaid duplicates Medicare payments at the same percentage as Medicaid reimburses a nursing facility for its total costs. After Oral Argument on the instant motion, this Court held a hearing on November 30 and December 1, 1998 to judge the propriety of this method of calculating duplication for the years in question. On the basis of the facts and testimony presented at this hearing, the Court agrees with Jewish Home that DSS's newest audit methodology is in contravention of *Jewish Home I*, and makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure Rule 52(c).

*The Federal Medicare and Medicaid Programs*

Congress enacted the federal Medicare program to provide Americans over the age of sixty-five (65) and certain disabled individuals with an inpatient hospital insurance plan ("Part A") and an optional supplementary insurance plan ("Part B"). *See* 42 U.S.C. § 1395 (1999) *et seq.* Part B includes certain physician and ancillary services, hospital outpatient services, and other health services generally not covered under Part A. *See Jewish Home I*, 954 F.Supp. at 97. In order to enroll in Part B coverage, a patient must pay an annual deductible and certain premiums. The patient then pays "co-payments" equal to 20% of the reasonable costs and charges for any services received. *See id.* The federal government pays the remaining 80%. *See id.* Medicare reimburses health care providers retrospectively on a fee-for-service basis for costs actually incurred in the year of service. *See* Transcript of Hearing dated November 30, 1998 ("Tr.") at 13–14.

Congress enacted Medicaid to provide access to health care for indigent individuals. *See* 42 U.S.C. § 1396 *et seq.* Medicaid is a joint federal and state funded system. *See id.* States electing to participate in Medicaid must propose a plan for approval by the Secretary of the United States Department of Health and Human Services. *See id.* at §§ 1396a(a), 1396a(b). The plan includes a schedule of payment rates for different kinds of medical services. *See id.* at § 1396a(a). Once approved, the federal government agrees to assist the state by providing federal Medicaid funds. *See id.* The New York State Department of Health ("NYSDOH"), into which DSS has merged, has been designated the "single state agency" responsible for the administration of New York's Medicaid plan statewide. *See* N.Y. Soc. Serv. Law § 363–a[1] (McKinney 1999–2000). It is also responsible for certifying participation of nursing facilities in the Medicaid

Arg.") at 16–19, 22; Transcript of Pre–Trial Conference dated October 13, 1998 at 4.

program and establishing their reimbursement rates. *See* N.Y. Pub. Health Law § 2808.

Under Medicaid, health care providers agree to accept the government rate as payment in full, and may not request that a patient pay any additional charges. *See* 42 U.S.C. § 1320a–7b(d). Unlike Medicare Part B, the Medicaid program reimburses nursing facilities prospectively at a per diem rate that represents payment for the totality of nursing facility costs for a patient. *See id.* at § 1396a(a). Rates in a given year are set on the basis of costs reported by a facility in a prior period, called the "base year," which are limited by applicable cost ceilings and increased by certain adjustments, and then trended forward to the "rate year" to account for inflation. *See* Tr. at 13, 18. The year 1983 is the applicable base year for the calculation of nursing facility Medicaid rates in this action. *See id.* at 13, 17–18.

The reimbursement rates for nursing facilities under Medicaid are composed of four components: direct, indirect, noncomparable and capital. *See* N.Y. Comp. Codes & Regs. ("N.Y.C.C.R.") tit. 10, § 86–2.10 (1999). The direct component reimburses base year costs related to patient care, including nursing administration, physical, occupational, and speech therapy, patient activities, social services, pharmacy, central services, supplies, and transportation services. *See id.* at § 86–2.10(c).[2] The indirect component reimburses base year costs not directly related to patient care, such as fiscal/administrative services, housekeeping, food services, medical education, and grounds/maintenance. *See id.* at § 86–2.10(d). The noncomparable component reimburses facility-specific base year costs which, because of their nature, are not subject to comparison with other facilities, including physician services, laboratory services, electrocardio-

grams, electroencephalograms, radiology, inhalation therapy, podiatry, dental, and psychiatric services, and other ancillary services.[3] *See id.* at § 86–2.10(f). The capital component reimburses certain building costs, fixed and moveable equipment costs, costs of capital improvements, and mortgage interest expense. *See id.* at. §§ 86–2.10(g), 86–2.19 to 86–2.22.

In 1986, NYSDOH implemented a new audit methodology known as "RUG–II," the substance of which remains in effect, which establishes patient classifications based on the estimated expected amount of resources necessary to care for each patient. *See* Tr. at 8; *see also New York State Association of Counties v. Axelrod,* 78 N.Y.2d 158, 162, 573 N.Y.S.2d 25, 27, 577 N.E.2d 16 (1991). A primary goal of the RUG–II methodology is to provide a financial incentive for nursing facilities to admit and provide care to more resource-intensive patients, whose cost of care in a nursing facility is less than in a hospital. *See* Tr. at 8, 19–21, 37.

The resource-intensiveness of a nursing facility's patients is reflected in that facility's case mix index ("CMI"). *See id.* at 8, 19. As a facility's CMI rises, the Medicaid reimbursement methodology positively adjusts the direct component of a nursing facility's reimbursement rate, which includes those costs attributable to physical, occupational and speech therapy, to reflect increases in the expected resources needed to care for sicker patients. *See id.* at 8, 19–21, 40–41. However, the RUG–II methodology does not provide any rate adjustment to account for increased noncomparable costs, such as physician and certain ancillary services. *See id.* at 21–23; 151. Rather, nursing facilities look primarily to Medicare Part B, if available, to compensate them for noncomparable costs incurred subsequent to their base

---

**2.** Physical, occupational and speech therapy are also reimbursed by the Medicare Part B program. *See* Tr. at 37–38. Other direct costs, however, are not covered by that program. *See id.*

**3.** Physician and certain ancillary services are also reimbursed by the Medicare Part B program. *See* Tr. at 21–22, 57.

year due to their admission of more resource-intensive patients.[4] *See id.* at 24.

*Dual Eligibles and the New Audit Methodology*

Indigent elderly and disabled, known as "dual eligibles," can qualify for both Medicare and Medicaid. *See id.* at 10–11. Because dual eligibles effectively cannot afford Medicare Part B, Congress established a "buy in" procedure whereby states could obtain Part B coverage for dual eligibles by agreeing to pay Medicare's cost-sharing amounts on their behalf. *See Jewish Home I,* 954 F.Supp. at 97–98.

Since Medicare Part B and Medicaid coverage overlap with respect to certain services, DSS performs audits to attempt to reconcile the differences between the two systems and recoup any Medicare Part B payments which may be duplicative of Medicaid payments. *See* 10 N.Y.C.R.R. § 86–2.17(m). As noted *supra,* in *Jewish Home I,* this Court found that DSS in performing such audits could not consider Medicaid as payment in full for all costs and expenses incurred by Jewish Home that were covered by Medicare Part B. *See Jewish Home I,* 954 F.Supp. at 100. Rather, Jewish Home was entitled to "100% of its reasonable costs and services, as calculated under Medicare," and, accordingly, DSS was entitled to recoup only those Medicare payments that were duplicated by Medicaid. *See id.*

Following this decision, DSS implemented the Medicare Part B audit methodology that is the subject of this action. Under this methodology, the State determines the Medicaid per diem rate for a given rate year and divides this figure by the total per diem cost of nursing facility operations in that rate year. *See* Tr. at 15, 28. This calculation yields a percentage that represents the extent of Medicaid reimbursement of total nursing facility expenses for the rate year in question. *See id.* The state assumes this percentage also represents the percentage of Medicare Part B costs that have already been paid for by Medicaid and proposes to recoup the nursing facility's Medicare Part B income at the same percentage.[5] *See id.* at 15.

On July 23, 1997, Jewish Home commenced the instant action seeking a judgment (i) declaring that the new Part B audit methodology, as developed and applied to Jewish Home, violates (a) the federal Medicare Act; (b) the due process and equal protection clauses of the United States Constitution; (c) the New York State Constitution, Administrative Procedure Act §§ 202 and 203, Executive Law § 102, N.Y.C.C.R. § 86–2.17(m), and common law; (ii) declaring null and void and without force and effect DSS' new Part B audit methodology; (iii) enjoining DSS from utilizing the new Part B audit methodology in any pending or future Part B audits of Jewish Home; (iv) enjoining defendant from recouping Jewish Home's Medicare Part B receipts pursuant to the

---

4. Jewish Home had no physician's costs in its base year of 1983, but subsequently added three physicians between 1984 and 1986 at a total cost of approximately $300,000. *See* Memorandum of Law in Support of Jewish Home's Motion of Summary Judgment dated May 11, 1998 ("Plaintiff's Memo.") at 9. This additional cost was incurred because Jewish Home's patient population was becoming increasingly resource-intensive. *See id.* Medicaid, however, paid Jewish Home nothing for this increase in physician costs during these rate years because it had no physician costs during its base year and because, as noted above, the CMI adjustment was inapplicable to such costs. *See id.* Similarly, while a nursing facility that had incurred physician

costs during its base year would have its reimbursement for such costs positively adjusted by an inflationary factor during subsequent rate years, it would not receive the benefit of the CMI adjustment to further increase such reimbursement. *See* Tr. at 21–22.

5. For example, if a nursing facility incurs overall costs of $1 million and Medicaid reimburses it $900,000, or at 90% of its total costs, the new methodology assumes that the Medicaid program has also reimbursed the facility for 90% of the costs of Medicare Part B services the facility performed. *See* Tr. at 30–31.

new Part B audit methodology; (v) enjoining DSS from utilizing any other Medicare Part B audit methodology in any pending or future Part B audits of Jewish Home and/or recouping Medicare Part B income from Jewish Home pursuant to any such other methodology unless and until such time as this Court has determined that such methodology has been properly and lawfully promulgated and is consistent with the rights of Jewish Home declared in *Jewish Home I* and in the instant action; and (vi) granting Jewish Home reasonable attorneys' fees and such other relief as the Court deems just.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a moving party's motion for summary judgment, the Court views all facts and construes all rational inferences derived therefrom in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

■ Dual eligible patients are primarily Medicare patients and a provider is entitled to receive the full Medicare rate for providing ancillary services to those patients. *See James Square,* 897 F.Supp. at 686–87. Accordingly, the State may not through its audit methodology deprive a nursing facility from collecting 100% of its reasonable costs and services as calculated under Medicare. *See Jewish Home I,* at 954 F.Supp. at 100. Rather, the State is entitled to recoup only those Medicare payments that "reflect[ ] what amounts to double coverage," i.e., those payments received for services that have also been paid for by Medicaid.[6] *Id.; see also James Square,* 897 F.Supp. at 687 (finding that the State "can only recover [Medicare Part B income] . . . to the extent that Medicaid actually paid for the [Medicare Part B covered] services"); 10 N.Y.C.R.R. § 86–2.17.

■ The evidence demonstrates and this Court finds that the State's newest Medicare Part B audit methodology is not designed to and does not accurately measure the extent to which Medicare payments duplicate those payments made by Medicaid. The new audit methodology assumes that the percentage of total nursing facility expenses paid by Medicaid also represents the percentage of Medicare expenses paid by Medicaid. *See* Tr. at 15, 28. However, a nursing facility's total yearly operating expenses bear only a minimal relationship to the facility's total Medicare expenses for that year. Two simple examples perhaps best illustrate this point. .

First, the single largest expense of a nursing facility, the cost of nursing, is not covered by the Medicare Part B program. *See id.* at 16. Therefore, the degree to which the State reimburses nursing expenses under Medicaid should have no effect upon a measure of duplication between Medicaid and Medicare Part B payments. Nonetheless, the State includes Medicaid reimbursement of nurs-

---

**6.** The State contends that the provisions of the Balanced Budget Act of 1997 ("BBA"), *see* 42 U.S.C. § 1396a, *et. seq.,* restrict Jewish Home's entitlement under the Medicare Act to 80% of its costs from the federal government, thereby prohibiting recovery of Medicare payments in this action. However, as the Court noted in rejecting defendant's cross-motion, the BBA addresses the Medicare Act and the sums due thereunder only insofar as it specifies that the State has no obligation to pay the 20% copayment for dual eligibles. *See* Oral Arg at 8–20; Jewish Home's Memorandum of Law in Opposition to Defendant's Cross–Motion for Summary Judgment dated August 7, 1998 at 2–6. In fact, the State of New York has by statute guaranteed this copayment will continue, *see* N.Y. Soc. Serv. Law § 367–a (1999), and because this election has been made, the BBA is not relevant to an analysis of Medicare cost reimbursement in this action.

ing expenses (in addition to other non-Medicare reimbursed costs) in its calculation of how much duplicate reimbursement has occurred. In fact, with respect to direct costs, the only nursing facility costs that could be paid by both Medicare and Medicaid are those associated with physical, occupational, and speech therapy. *See id.* at 38–40. These costs are the only direct costs relevant to a determination of duplicate reimbursement by Medicare Part B and Medicaid, and the State's audit methodology should reflect this reality. *See id.*

Similarly, while Medicare covered approximately $300,000 in physician costs incurred by Jewish Home between 1984 and 1986, Medicaid paid nothing to Jewish Home to offset such costs.[7] *See* Plaintiff's Memo. at 8–9. Nonetheless, the State's audit methodology inappropriately assumes that Jewish Home was reimbursed for such expenses by Medicaid at a rate equal to the percentage that Medicaid pays in relation to overall facility costs.[8] *See* Tr. at 29, 31, 164–65. This inclusion of physician services in the calculation of costs that have been duplicated by Medicaid is clearly improper as a matter of law. Indeed, even the State's expert witness, whose credibility and competence the Court finds highly questionable,[9] was forced to admit that the State's audit

methodology did not accurately reflect duplication with respect to Jewish Home's physician's costs. *See id.* at 151–52.

The Court also finds incredible the State's contention that no other feasible audit methodology is available to more accurately assess duplication of Medicaid and Medicare payments. Each year, a nursing facility's base year cost report must be filed with the NYSDOH. *See id.* at 49–50. This cost report includes a line-item breakdown of costs incurred by such facilities, a breakdown that includes discrete costs for services covered by both Medicare Part B and Medicaid. *See id.* at 56–58. As demonstrated by plaintiff's experts, whom this Court finds fully credible, the State can easily determine Medicaid reimbursement for each such line item to assess duplication of Medicare payments with respect to these discrete costs. *See id.* at 36, 53, 57–58.

Moreover, the Court finds that to the extent necessary rate adjustments including the CMI and inflationary factors can be applied specifically to each of these discrete line items to determine the correct amount of Medicaid reimbursement per line item. *See id.* at 36–38. As described above, the CMI and inflationary factors are rate adjustments applied to a nursing facility's base year cost calculation

---

7. As noted *supra,* this is because Jewish Home had no similar costs in its base year of 1983 and because the CMI adjustment is not applied to such costs. *See* Plaintiff's Memo. at 8–9; Tr. at 21–22; 164.

8. For example, assuming Medicaid paid 90% of Jewish Home's overall costs for a particular year, and Jewish Home had $50,000 in physician-related expenses, the State's methodology assumes that Medicaid reimbursed Jewish Home for $45,000 of such costs and would recoup this $45,000. *See* Tr. at 31. In fact, as noted above, it would have paid nothing for such services. *See id.*

9. Unlike plaintiff's experts, defendant's expert was experienced only in the area of nursing facility audits, and had no experience in the development of reimbursement methodologies, the Rug II system or the CMI. *See* Tr. at 119–120. Defendant's expert was also unable

to explain several statements in his affidavit, including such crucial items as the basis upon which he determined that nursing homes used in his analysis could be considered "typical." *See id.* at 155. The Court also draws an adverse inference from defendant's failure to call Mr. Carl Dombroski, director of the State agency responsible for establishing and revising rates for Medicaid reimbursement, to explain the State's rationale in developing the new audit methodology. *See id.* at 130; *N. Sims Organ & Co. v. SEC,* 293 F.2d 78, 80–81 (2d. Cir.1961), *cert denied,* 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962). Such an inference is particularly warranted given defendant's expert's testimony that Mr. Dombroski believed that physician cost recoupment should be calculated in a manner consistent with the approach of plaintiff's experts, as discussed *infra. See id.* at 133.

which increase the amount of Medicaid payable to the facility for the specific rate year in question. *See id.* at 8, 19–21. The CMI in particular is a rate adjustment designed to compensate a nursing facility for taking in more resource-intensive patients since its base-year calculation was made. *See id.* Most relevant here, the CMI is a Medicaid adjustment applied to all direct costs, including costs for physical, occupational and speech therapy, costs that are also covered by Medicare. *See id.* at 40–41.

While the State claims that the CMI adjustment makes a discrete line-item calculation of Medicaid reimbursement of direct costs impossible, the Court finds this argument meritless.[10] *See id.* at 95. As admitted by defendant's expert, prior to making any other reimbursement calculations, the State applies the CMI adjustment *uniformly* to *all* direct costs reimbursed by Medicaid. *See id.* at 95; *see also id.* at 47, 52. Simple logic thus dictates that the State can apply the CMI adjustment to each individual direct cost component, specifically those costs for physical, occupational, and speech therapy, to determine what portion of the CMI is attributable to such component. *See id.* at 39–47; 96–100, 192. This breakdown would not effect the sum total of the CMI adjustment in any way, and ultimately will produce a more accurate calculation of payment duplication.[11]

In sum, because the Court rejects defendant's contention that no feasible audit methodology can more accurately measure duplication between Medicare and Medicaid Part B, plaintiff is entitled to summary judgment on its claim that defendant is in violation of the federal Medicare Act. The Court need not reach Jewish Home's other arguments that such audit methodology violates the due process and equal protection clauses of the United States Constitution, the New York Constitution, or New York statutory, regulatory and common law.

## CONCLUSION

For the reasons stated above, Jewish Home's motion for summary judgment is hereby granted. The Court declares that the newest Medicare Part B audit methodology employed by the State, as developed and applied to Jewish Home, is in violation of this Court's ruling in *Jewish Home I* and the federal Medicare Act. Such methodology is therefore null and void and without force and effect. Defendant is enjoined from utilizing the new Medicare Part B methodology in any pending or future Medicare Part B audits of Jewish Home and from recouping Jewish Home's receipts pursuant to this methodology. The Court denies Jewish Home's request for attorneys' fees pursuant to 42 U.S.C. § 1988. The Clerk of the Court is direct-

---

10. As noted previously, the CMI is not used in calculating Medicaid reimbursement for non-comparable costs like physician services. *See* Tr. at 22–23, 164. Thus, this rate adjustment in no way affects the State's ability to calculate on a discrete basis how much Medicaid paid for these services. For example, in the case of Jewish Home, Medicare reimbursed Jewish Home for its physician costs. *See* Plaintiff's Memo. at 8–9. Medicaid, however, paid absolutely nothing for physician costs for the years in question, and the CMI does not operate to increase this amount. *See id;* Tr. at 22–23, 164. Thus, no duplication of payments with respect to such costs was possible, and the State cannot improperly rely upon the CMI to obfuscate this issue.

11. Defendant cannot argue that the CMI varies according to each of the discrete cost components, as it currently applies the CMI uniformly to all such components in its current audit methodology. *See* Tr. at 95. Indeed, even if such variation occurred, the State could adjust the CMI multiplier for each component to reach an accurate reimbursement figure as to each component. *Accord James Square,* 897 F.Supp. at 687 (noting that even if "it may be difficult to develop a formula which would more accurately reflect the percentage of per diem attributable to ancillary services [this] does not absolve the state of its responsibility to do so").

**600**

ed to enter judgment accordingly and close the above-captioned action.

It is SO ORDERED.